**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 11-cv-01760-WJM-CBS

GEORGE F. LANDEGGER, and
WHITTEMORE COLLECTION, LTD.,

    Plaintiffs,

v.

HOWARD S. COHEN, and
DENNIS YOUNG
ASPEN PACIFIC CAPITAL, INC., and
ASPEN PACIFIC GROUP, INC.

    Defendants.

## ORDER DENYING SUMMARY JUDGEMENT ON PLAINTIFF'S STATE CLAIM

This matter is before the Court on Defendants Howard Cohen, Dennis Young, Aspen Pacific Capital, Inc., and Aspen Pacific Group,Inc.'s ("Defendants") Motion for Summary Judgment ("Motion"). (ECF No. 115.)   Plaintiffs George Landegger and the Whittemore Collection, Ltd. have filed a Response (ECF No. 116); and Defendants a Reply.[1]  (ECF No. 117.)

For the reasons set forth below, the Court denies Defendants' Motion to the extent that it seeks judgment on Plaintiff's claim under Nevada Securities Law (the "State Claim").  No findings, at this stage, are made with respect Plaintiff's claim brought pursuant to Securities Exchange Act of 1934 (the "Federal Claim").

---

[1] Unless context demands otherwise, Plaintiffs George F. Landegger and the Whittemore Collection, Ltd will collectively be known as "Plaintiff" on the basis that Landegger owns and controls The Whittemore Collection, Ltd.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l General Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

Summary judgment must be granted where a party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). There, the Court held that defendant could meet its initial burden for summary judgment "by 'showing' that there [was] an absence of evidence to support the nonmoving party's case." *Id.* at 325. When "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden on a motion for summary judgment by identifying a lack of evidence for the nonmovant on an essential element of

the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). If the movant meets this burden, the burden shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671.

## II. BACKGROUND FACTS

### A. Nature of the Action

The contracts involved in this case are complex; the law equally so.[2] The schematic appended to this Order is illustrative. ("Exhibit A"). The core of the dispute centers on Plaintiff's purchase of securities in a transaction that was brokered by Defendant Cohen and Defendant Young. Plaintiff purchased the securities in a second round of capital raising for a company called KSpace, LLC, a California limited liability company ("KSpace").

Plaintiff's Amended Complaint alleges that—contrary to federal law and Nevada law—Defendants were not registered and violated the relevant statutes by entering into securities transactions with Plaintiff. (See generally, ECF No. 47 at 1-2.) Plaintiff contends that, under Nevada and federal statutes, he is entitled to the "consideration paid" for the securities to Defendant Cohen and Defendant Young. (*Id.* at 10) Additionally, because Defendant Cohen conducted his brokering activities through Defendants Aspen Pacific Capital, Inc ("AP Capital") and/or Aspen Pacific Group, Inc

---

[2] The Court notes that one of the reasons why it has not addressed the Federal Claim in this Order is because it is one of first impression in the Tenth Circuit. Further research and analysis, beyond what is stated in this Order, is required to reconcile the conflicts in sister circuits.

3

("AP Group"), Plaintiff also alleges that he is entitled to recovery from these entities as well. (*Id.* at 2)

### B. Background Facts

For the purposes of Defendants' Motion, the following facts are viewed in the light most favorable to the nonmoving party:

KSpace was formed by two California doctors, Robert Heller and Adam Bazih. The doctors had invented a medical device which they patented and sought to bring to market through capital funding. (ECF No. 98-1 at 10-11.) In February, 2010, KSpace engaged Defendant AP Capital to raise capital and to provide other services to KSpace. (*Id.*)

At all relevant times, Defendant Cohen was the President and 100% shareholder of AP Capital, and Defendant Young was a Managing Director of Technology of AP Capital. (ECF No. 97 at 7, 8, 13, 14.) In effectuating the sales of the membership interests involved in this case, Cohen and Young were both acting as authorized representatives of AP Capital. (Id. at 7.)

To raise capital for KSpace, the Defendants utilized a structure involving a newly formed single-purpose entity referred to as an "investment vehicle." (Id. 12-13.) New investors would purchase membership interests in the "investment vehicle", which in turn would purchase membership interests in KSpace. (ECF No. 100-35.) The first investment vehicle formed was Aspen KSpace, LLC, a Nevada limited liability company ("AKS-I"). AKS-I was managed by Aspen Pacific Asset Management, LLC ("APAM"), through its Manager, Defendant AP Group and Defendant Cohen being President of

same.  (ECF No. 98-9.)

On February 9, 2010, AKS-I purchased approximately 37% of the membership interests in KSpace for $1,590,000.  (*Id.* at 10.)  AKS-I also agreed to lend KSpace an additional $410,000, for a total of $2 million in new capital for KSpace.  (ECF No. 98-10; ECF No. 98-11.)   As a part of the AKS-I transaction, Defendant AP Group received a 20% interest in AKS-I, forming part of the consideration for raising capital for the company, KSpace.  (ECF No. 98-3 at 30,33-34.)  Between February and June, 2010, Cohen and Young raised $2 million for KSpace from 15 separate investors in AKS-I, excluding Cohen's and Young's investments through their investment entities H&L Cohen, LLC and Young Investments, LLC.  (ECF No. 98-12.)

The $2 million that Cohen and Young raised through the first investment vehicle (AKS-I) turned out to be insufficient to finish development of KSpace's product.  (ECF No. 98-4 at 168.)   In September, 2010, KSpace authorized Cohen and Young to raise an additional $1 million, which later occurred through Plaintiff's investments.  (*Id.*)

For purposes of Plaintiff's investments, Defendant Cohen formed a second "investment vehicle", Aspen KSpace II, LLC ("AKS-II").  (ECF No. 98-13.)   Similar to AKS-I, this second investment vehicle was run through its manager, Defendant AP Group, which in turn was managed by Defendant Cohen.  (ECF No. 115-1 at 8.)

On November 22, 2012, the closing of the AKS-II financing transaction occurred, involving 21 separate instruments executed variously by Plaintiffs, KSpace and its members, AKS-I and its members, AKS-II and its members, AP Capital, and AP Group.  (ECF No. 98-14.)

The AKS-II closing documents included the following:

(a) Subscription Agreements between Plaintiffs and AKS-II, under which Plaintiffs Landegger and Whittemore collectively paid $1 million for 80% of the membership interests in AKS-II (ECF No. 115-1; ECF No. 115-2.);

(b) Operating Agreement of AKS-II between and among Plaintiffs and AP Group, in which AP Group acquired the remaining 20% interest in AKS-II (ECF No. 98-15);

(c) Preferred Membership Interest Purchase Agreement between KSpace and AKS-II, under which AKS-II agreed to purchase an 18.7% membership interest in KSpace for $795,000 (ECF No. 98-16);

(d) Amended and Restated Secured Note made by KSpace in favor of AKS-I and AKS-II in the amount of $615,000, in consideration of $205,000 newly loaned to KSpace by AKS-II and $410,000 previously loaned by AKS-I (ECF No. 98-17);

(e) Amended and Restated Security Agreement between and among Kspace, ASK-I, and AKS-II, in which KSpace pledged its assets to secure the Note (ECF No. 98-18);

(f) Participation Agreement and Assignment of Participation Interest between ASK-I and AKS-II, defining their relationship as co-lenders to KSpace (ECF No. 98-19);

(g) Action by Written Consent of the Manager of AKS-II (APAM, through its Manager, AP Group) and Members of AKS-II (Plaintiffs and AP Group), consenting to the financing transaction documents (ECF No. 98-21);

(h) Second Amended and Restated Operating Agreement of KSpace, signed by the members of KSpace to accommodate the new issue of KSpace membership interest to AKS-II (ECF No. 98-22);

(i) Action by Written Consent of the Management Committee and Members of

KSpace, signed KSpace and its members to consent the AKS-II financing transaction documents (ECF No. 98-23); and

(j) Amended and Restated Consulting Agreement between KSpace and AP Capital, providing for increased fees to be paid by KSpace to AP Capital. (ECF No. 98-24).

According to Dr. Bazih, founder of KSpace, the Amended and Restated Consulting Agreement between KSpace and AP Capital was "believed" to be executed as an integral part of the November 22, 2010, AKS-II transaction. (ECF No. 98-1 at 83.) Moreover, the appended schematic illustrates key aspects of the KSpace transactions—including the contracts between the investment vehicles, KSpace, some Defendant entities and Plaintiffs Landegger and the Whitmore Collection Ltd. (See Exhibit A.)

The Court has relied upon this schematic as a reference point in disposition of Defendant's Motion on the State Claim. It is hardly, though, a model of clarity. To this point, the Court notes that supplemental briefing was recently sought in this case to update the case law that may have evolved since Defendants' Motion was originally filed in late December 2012. (ECF No. 113.) The Court also afforded Defendants an opportunity to provide the Court with its own schematic. Defendants declined this invitation which only reinforces the difficulty in conceptualizing the contractual relationships at issue in this suit.

### III. ANALYSIS

Plaintiff alleges that Defendants have violated Nevada Revised Statute § 90.310(1). That section provides: "It is unlawful for any person to transact business in this State as a broker-dealer or sales representative unless licensed or exempt from licensing under this chapter." (ECF No. 47 at 8.) Plaintiff alleges that Defendants Cohen and Young violated § 90.310(1) by transacting business in Nevada in connection with securities without being licensed as a securities broker in the State of Nevada. (*Id.*)

Defendants contest Plaintiff's State Claim under Nevada law. Defendants contend that Plaintiff cannot show that they were brokers—*i.e.,* that Defendants were engaged in the business of effecting securities transactions, because Defendants did not regularly participate in prior securities transactions to show they were actually engaged in a securities broker business. Defendants further contend that Plaintiff cannot show that other facts and factors, in addition to regularity of participation, establish that Defendants were acting as brokers.[3] (ECF No. 115 at 3.)

---

[3] In making these points, Defendants should have been mindful that, in the context of summary judgment, it is Defendants that must meet an initial burden "by 'showing' that there [was] an absence of evidence to support the nonmoving party's case." *Bausman*, 252 F.3d at 1115. When "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden on a motion for summary judgment by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* If the movant meets this burden, the burden shifts to the nonmovant (here, Plaintiff) "to go beyond the pleadings and set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. For at least one to two of the factors below— that go to the whether Defendants were brokers (being an element of the State Claim)— Defendants do not identify a lack of evidence and thus do not discharge their initial burden as to these factors. Presumably, this is why they have conceded to some of these factors; while, at the same time, not conceding the element altogether but just factors that go to analyzing same. But in doing so, Defendants must have realized they faced an uphill battle in order to succeed in a Rule 56 setting when such concessions are made.

### A.     Relevant Law

The key issue in this case is whether Defendants fall within the definition of "broker" under Nevada Revised Statute § 90.310(1).  While Nevada law is controlling, the Parties have not, however, cited any case law that interprets the relevant section of the statute. Because of this, the Parties jointly submit that Nevada courts would look to federal law to determine the meaning of broker status.  (ECF No. 116 at 23; ECF No. 115 at 12-13.)  If this is how the Parties put their case; there is no reason for this Court to disturb that approach—an approach that is centered around the *Hansen* factors as addressed below. *SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)

Relevantly, Section 3(a)(4) of the Securities Exchange Act of 1934 defines a broker as "any person engaged in the business of effecting transactions in securities for the account of others."   While neither party has cited relevant Tenth Circuit authority, courts outside the circuit provide guidance.  Such cases have considered the meaning of the term "broker" by looking to whether a person *regularly participates* in securities transactions at key points in distribution.  *Hansen*, 1984 WL 2413, at *10 (*citing Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*, 411 F. Supp. 411, 415 (D. Mass.), *aff'd,* 545 F.2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904 (1977)).[4]

---

[4] The definition of broker is well contrasted with that of a finder.  If an individual is a "finder" rather than a broker he is not required to register under the Exchange Act. "The distinction drawn between the broker and the finder is that the latter bring[s] the parties together with no involvement on [his] part in negotiating the price or any of the other terms of the transaction." *Salamon v. Teleplus Enters., Inc.*, 2008 WL 2277094, at * 13 (D.N.J. June 2, 2008).   The line between finder and broker is not always difficult to draw. *See Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *6 (D. Neb. Sept.12, 2006); *see Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.* 93 F.Supp.2d 220 (2000).

Courts also apply a multi-factor test to determine whether a person's activities constitute broker status. That inquiry is fact-intensive. It looks to: (i) whether the person works as an employee of the securities' issuer; (ii) whether he receives a commission rather than a salary; (iii) whether he sells or has sold the securities of another issuer; (iv) whether he participates in negotiations between the issuer and investor; (v) whether he provides advice or a valuation as to the merit of an investment; and (vi) whether he actively, rather than passively, finds investors. *See Hansen*, 1984 WL 2413, at *10;[5] *S.E.C. v. Kramer*, 778 F.Supp.2d 1320, 1334 (M.D.Fl. 2011); see also *S.E.C. v. Martino*, 255 F.Supp.2d 268, 283-84 (S.D.N.Y. 2003) (holding that defendants plainly acted as unregistered brokers where they regularly solicited overseas clients to engage in securities transactions, regularly acted as middlemen between the U.S. sellers and foreign purchasers to complete these transactions, were not employed by their clients, were paid on a commission basis, participated in the sale of stock of numerous issuers

---

[5] In *Hansen*, the defendant worked as an advisor to investors, providing consulting services to independent oil and gas producers. Vaught Oil Company ("VOC") was an oil and gas exploration company with its headquarters in Ohio and which maintained an office in New York City for the relevant period from June 1979 through November 1981 (the "relevant period"). VOC was a sole proprietorship, owned and operated by Bill D. Vaught. During the relevant period, 26 separate VOC oil wells (the "VOC programs") were offered and sold to the public. Most of those interests were in the form of a 1/32 interest in a particular well. Defendant Hansen was associated with VOC throughout the relevant period, and during that time promoted and sold to the public interests in all 26 of the VOC programs. Hansen received a 15% commission on each interest he sold in the programs, earning almost $400,000 in commissions from VOC. The Court held that defendant acted as an unregistered broker in violation of Section 15(a)(1) because he "regularly participated at key points in the" securities transaction, was not a salaried employee of the issuer, "received commissions on his sales of interests in the [securities] program," "[previously] had sold securities of ... another issuer, but [was] ... denied [his] broker-dealer registration application as a result of securities laws violations during the course of that offering," "active[ly] and aggressive[ly] [found] ... investors and ... frequently gave those investors extensive advice with regard to the merits of the [securities] programs". *See Hansen,* 1984 WL 2413, at *10.

over a period of several years, and assisted in negotiating the stock sales at issue); *S.E.C. v. Martino*, 255 F.Supp.2d 268, 283 (S.D.N.Y. 2003) (listing the factors stated in *Hansen*).

Of these factors, some courts have also held that the transaction-based compensation factor, is one of the hallmarks of broker status.  The underlying concern being that such compensation represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent.  *Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985, *6 (D. Neb. 2006). *S.E.C. v. Sky Way Global, LLC*, 2010 WL 5058509, *2 (M.D. Fla. 2010); *DeHuff v. Digital Ally, Inc.*, 2009 WL 4908581, *3 (S.D. Miss. 2009).

Other courts have also held that regularity of participation "is the primary indicia of being 'engaged in the business'" for the purposes of the broker definition.  *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 12 (D.D.C. 1998) (finding defendants acted as brokers when they together solicited 40 investors and received a total of $1.7 million in investments); *SEC v. Margolin*, 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992) (the court finding that the broker definition was met where defendant provided clearing services for the securities trading of his clients, participated in dozens of transactions for various clients demonstrating regularity of business activity, received transaction-based compensation, advertised for clients, and possessed client funds and securities); see *Foundation Ventures, LLC v. F2G, Ltd.*, 2010 WL 3187294, *1, *7, (S.D.N.Y. Aug.11, 2010)  (stating in a Rule 12(b)(6) context that "on the present record, there is no indicia that FV sells or previously sold securities of other issuers, that FV makes valuations or gives advice regarding the merits of an investment, and that FV participates in

negotiations between the issuer and the investor.")

The Court finds the *Hansen* factors useful in determining whether a person's activities constitute broker status in cases such as the instant one.  The Court also finds that the factors going to (1) transaction-based compensation, and (2) regularity of participation, should *be afforded heightened weight* in the calculus.   (*emphasis added*.) Both factors resonate with the intent that underlies securities legislation: to target those persons who hold themselves out as brokers, and to prevent such persons from abusive sales practices—incentivized by commission—that registration is intended to regulate and prevent.

But in affording weight to these factors, a court must take a measured approach. These two factors must not be weighted so heavily so as to subsume the others in the analysis. Specifically, these factors should not swallow what is ultimately a fact-intensive definition—and one as to which the SEC Commission has been unwilling to create the necessary guidance in order to provide clarity. *See* John L. Orcutt, *Improving the Efficiency of the Angel Finance Market: A Proposal to Expand the Intermediary Role of Finders in the Private Capital Raising Setting*, 37 Ariz. St. L.J. 861, 904-05 (2005); Samuel Hagreen, *The Jobs Act: Exempting Internet Portals from the Definition of Broker-Dealer*, 90 Denv. U. L. Rev. 73 (2013).

The Court next turns to application of the *Hansen* factors to the facts presented in this case.

### B. Application of the Hansen Factors

To determine whether Defendants were brokers, the *first factor* to assess is whether Defendants were employees of an issuer. This factor has been conceded by Defendants.[6] Defendants' specifically acknowledge that they were *not* employed by the investment vehicles (AKS-I or AKS-II) which provided the capital rasing for the company, KSpace. Defendants acknowledge that this factor weighs against them. (ECF No. 115 at 19.)

The *second factor* similarly cuts against Defendants—*i.e.*, whether the compensation that flowed to each of them was transaction-based, not salary. To this point, Defendants make little (if any) reference addressing what is a "hall-mark" factor of the analysis; a factor that this Court affords added weight to for reasons stated earlier. *See Cornhusker*, 2006 WL 2620985, at *61; *see also Sun River Energy, Inc. v. Nelson*, 2013 WL 1222391 (D. Colo. 2013) (finding that "many courts find incentive-based

---

[6] There is some ambiguity as to who is the issuer in this case. This is compounded by the complex structure of Plaintiff's investment. See Exhibit A. Read as a whole, a good portion of the evidence tends to point to AKS-II being the issuer and the schematic also reinforces this point; but, ambiguity still persists. For example, in some passages, Plaintiff indicates that AKS-II was the issuer; while in other passages Plaintiff states that "neither Cohen nor Young was an officer, employee, or manager of Kspace." (See ECF No. 116 at 14.) This latter passage is stated in context where the analysis is looking to whether Defendants were employees of an issuer with respect to factor one. To reconcile these ambiguities, and solely for the purposes of summary judgment, factual ambiguities must be resolved against the moving party, thus favoring Plaintiff's right to a trial in this case. *Houston*, 817 F.2d 85. Reading all of the relevant documents, as a whole, also suggest AKS-II is the issuer for the issuance of the securities relevant to the Plaintiffs in suit. But while the principle in *Houston* assists Plaintiff in resolving the ambiguity, this Court expects more. Plaintiff is pushing this case towards trial, and should it get there without settlement beforehand, the Parties are put on notice that more will be expected of them with respect to the specificity of the filings, whether that be, *inter alia*, jury instructions or verdict forms.

compensation to be particularly indicative of broker-type activities").[7]

Here, Defendants have conceded that they were not salaried employees. (ECF No. 115 at 19.)   If Defendants were not salaried employees, what were they? And how were they paid?   The Court draws the inference against Defendants that they were either consultants or contractors, receiving compensation based on transactions or commissions.  Facts in the record also tend to support this view.  For example, and while convoluted by the contractual relationships depicted in Exhibit A, there is evidence in the record that Defendants received transaction-based compensation in the form of an 8% commission on funds raised for KSpace in AKS-I and AKS-II.  (ECF No. 116 at 13.)   The fact that Defendants failed to challenge this evidence only reinforces this factor against them—particularly in the context of a Rule 56 motion.  *Anderson*, 477 U.S. at 248.

Neither Plaintiff or Defendants deal directly with the *third factor*.  While it may have some overlap with other factors, the Court finds that regardless of which way this factor falls, it bears no impact on the conclusion that this case is ripe for jury determination.

As to the *fourth factor,* Defendants concede that they were involved in negotiating the terms of Plaintiff's investment.  (ECF No. 115 at 6; ECF No. 116 at 4.) Specifically, Defendants admit that they provided Plaintiff with materials from

---

[7] The Court notes that despite seeking supplemental briefing on whether the case law has evolved since the filing of their initial briefs in 2012, the Parties indicated that no law was found.  However the Parties failed to locate *Sun River Energy, Inc. v. Nelson*, 2013 WL 1222391 (D. Colo. 2013)—a case of this district which was handed down earlier this year.  The Court is puzzled as to how the Parties did not locate this case given the scope to provide the Court with supplemental briefing.

14

K-Space—including information regarding intellectual property, operating documents, business summaries, and financial information. (*Id.*) This factor clearly points in favor of Plaintiff.

Defendants contest the *fifth factor—i.e* that Defendants made valuations regarding the merits of the investment in KSpace. Their primary argument being: it was not Defendants who provided valuations; rather, it was the valuations and opinions of others that led Plaintiff to decide to invest in KSpace. (ECF No. 115 at 19.)  Specifically, Defendants point to evidence that Plaintiff (1) performed his own due diligence regarding KSpace, and (2) obtained advice from Dr. Shahid (finding him an"extremely reliable source") before he entered into contracts with Defendants for issuance of the securities in AKS-II. (ECF No. 115 at 6).  Because of this, Defendants argue that they cannot be found to be a valuer of the investment because this was effectively 'outsourced' to others. On first blush, there is merit in this contention.

Plaintiff Landegger counters Defendants' position as to valuation.  He argues that Defendants provided him with "a conservative sales case" for KSpace, projecting returns on investment of nine to forty times the initial investment. (ECF No. 116 at 15.) Plaintiff also points to evidence that Defendants asserted that these financial gains could take no more than five years to accomplish. (*Id.*)

While there is merit in Defendants' position, the Court notes that credibility determinations may be a relevant to this factor. Credibility is a province of the jury—not the Court.  And because such determinations are in inappropriate in the context of a Rule 56 motion, the Court finds that the fifth factor tips marginally in Plaintiff's favor for the purposes of defeating Defendants' Motion because it cannot be disposed of as a

15

matter of law before jury assessment.[8]  *See Houston*, 817 F.2d at 85.

As to the *sixth factor*, Defendants do not concede that they were actively finding investors; but the evidence tends to show that they were.  The evidence demonstrates that Defendant Young contacted at least twenty-one potential investors regarding the KSpace opportunity.  (ECF No. 116 at 16-17.)  Defendant Cohen also affirmatively sought out the assistance of Sigurd "Sig" Johnsen to find investors.  (*Id.* at 26.)  The Court finds that this evidence gives rise to the inference that Defendants were not passive in their efforts to raise funds for KSpace. And given that inferences are made in favor of a non-moving party, the Court concludes that Defendants efforts were more towards the aggressive-investor end of the spectrum. As such, this factor falls in favor of Plaintiff in showing that Defendants were brokers for the purposes of a Rule 56 ruling.

The *final factor* is heavily contested by Defendants—*i.e.*, whether there was regularity of participation by Defendants in securities transactions at key points of distribution.  Specifically, Defendants contend that they were engaged in only a few "isolated transactions" between 2008 until the end of 2011.  (ECF No 115 at 16-17.)  At most, Defendants contend, they only "participated" in seven transactions that involved completed investments.  (ECF No. 115 at 4-5.)  Defendants argue that this evidence shows a lack of regularity of participation in the brokerage business, and because this factor is a significant one, it is enough to support the grant of summary judgment.  Much

---

[8] The Court notes that the analysis is a holistic one.  All the factors must be weighed in the aggregate.  It is not that any one factor defeats Defendants' Motion *per se*, rather, it is the case where there are several cumulative factors when the summary judgement record is examined as a whole.  *See Foundation Ventures, LLC v. F2G, LTD.*, 2010 WL 3187294, *6 (S.D.N.Y. 2010)(finding that the analysis must be taken as whole).

reliance is placed on *Hansen*, 1984 WL 2413 (finding defendant was a broker where there were 26 transactions over two year period) and *Margolin*, 1992 WL 279735, at *5 (where there were dozens of transactions during an approximate one-year period indicating regularity of participation).[9]

Plaintiff argues, however, that there is evidence in the record to suggest that there were more than seven transactions. (ECF No. 116 at 27; ECF 98-12.) The Court need not run though all of that evidence. It is safe to say that this evidence creates a factual dispute. But even if Defendants' version of the facts were accepted as true (which they cannot be at this juncture), other factors, above, outweigh this factor for the purposes of determining broker status under Nevada law. As such, the Court finds (1) that there are enough facts in dispute to warrant a jury trial as to this factor, and/or (2) that even if this factor did sway in Defendant's favor, it is not enough for the Court to conclude that Defendants' Motion should be granted on Plaintiff's State Claim.

In sum, and weighing the factors as whole, the Court finds in favor of Plaintiff for the purposes of summary judgment. Given the factual disputes above, the Court cannot conclude that Defendants were **not** brokers, as a matter of law, under Nevada Revised Statute § 90.310(1). Not only are there facts in dispute, but the evidence as presented tends to cut in favor of Plaintiff's position—*i.e.* that Defendants were brokers with respect to securities transactions in this case. But this view, of course, is limited to the

---

[9] Defendants reliance on *Hansen* may be short-lived given that the court in that case also found that the defendant was (1) not a salaried employee of the issuer, (2) received commissions on his sales of interests in the securities program, (3) actively and aggressively found investors, among other factors. The Court finds that there are several parallels with this case. *Hansen*, 1984 WL 2413, at *10.

17

summary judgment context where all inferences and ambiguities are found in favor of the non-moving party. At trial, a jury could possibly find differently, particularly given the fact-specific nature of the *Hansen* factors, credibility determinations and the uncertainty that those factors present to the broker status calculus.

### IV. Conclusion

Based on the foregoing, the Court ORDERS as follows:

1. Defendants' Motion for Summary Judgment (ECF No. 115) on Plaintiff's State Claim is DENIED .

2. No findings, at this stage, are made with respect to the Federal Claim pursuant to Securities Exchange Act of 1934.  The Court will rule on Defendants' Motion for Summary Judgment on the Federal Claim by way of separate Order.

Dated this 30th day of September, 2013.

BY THE COURT:

William J. Martinez
United States District Judge