**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 11-cv-01760-WJM-CBS

GEORGE F. LANDEGGER, and
WHITTEMORE COLLECTION, LTD.,

      Plaintiffs,

v.

HOWARD S. COHEN, and
DENNIS YOUNG
ASPEN PACIFIC CAPITAL, INC., and
ASPEN PACIFIC GROUP, INC.

      Defendants.

---

## ORDER DENYING SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL CLAIM

---

This matter is before the Court on Defendants Howard Cohen, Dennis Young, Aspen Pacific Capital, Inc., and Aspen Pacific Group, Inc.'s ("Defendants") Motion for Summary Judgment ("Motion"). (ECF No. 115.)   Plaintiffs George Landegger and the Whittemore Collection, Ltd. have filed a Response (ECF No. 116); and Defendants a Reply.[1]  (ECF No. 117.)

For the reasons set forth below, the Court denies Defendants' Motion with respect to Plaintiff's claim brought pursuant to Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. §§ 78 *et seq.*

---

[1] Unless context demands otherwise, Plaintiffs George F. Landegger and the Whittemore Collection, Ltd. will collectively be known as "Plaintiff" on the basis that Landegger owns and controls The Whittemore Collection, Ltd.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (*citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

Although a court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

## II. BACKGROUND FACTS

### A.     Nature of the Action

The contracts involved in this securities case are complex; the law equally so.

The schematic appended to this Order is illustrative.  ("Exhibit  A"). The core of the

dispute centers on Plaintiff's purchase of securities in a transaction that was brokered

by Defendants Cohen and Young.   Plaintiff purchased the securities in a second round

of capital raising for a company called KSpace, LLC, a California limited liability

company ("KSpace").

Plaintiff's Amended Complaint alleges that—contrary to federal law and Nevada

law—Defendants were not registered and violated the relevant statutes by entering into

securities transactions with Plaintiff.  (*See generally*, ECF No. 47 at 1-2.)  Plaintiff

contends that, under Nevada and federal statutes, he is entitled to the "consideration

paid" for the securities to Defendants Cohen and Young.  (*Id.* at 10.)

 Additionally, because Defendant Cohen conducted his brokering activities

through Defendants Aspen Pacific Capital, Inc ("AP Capital") and/or Aspen Pacific

Group, Inc ("AP Group"), Plaintiff alleges that he is entitled to recovery from these

entities as well.  (ECF No. 47 at 2.)

The Court notes that it has previously denied summary judgment with respect to

the Nevada law claim (also known as the "State Claim").  (ECF No. 121.)  The instant

Order solely deals with the claim brought under the Exchange Act (the "Federal Claim")

and the issues relevant to same.

B.      **Background Facts**

For purposes of Defendants' Motion, the following facts are viewed in the light most favorable to the nonmoving party:

KSpace was formed by two California doctors, Robert Heller and Adam Bazih. The doctors had invented a medical device which they patented and sought to bring to market through capital funding.  (ECF No. 98-1 at 10-11.)  In February, 2010, KSpace engaged Defendant AP Capital to raise capital and to provide other services to KSpace. (*Id.*)

At all relevant times, Defendant Cohen was the President and 100% shareholder of AP Capital, and Defendant Young was a Managing Director of Technology of AP Capital.  (ECF No. 97 at 7, 8, 13, 14; ECF No. 99-10.)  In effectuating the sales of the membership interests involved in this case, Cohen and Young were both acting as authorized representatives of AP Capital.  (*Id.* at 7.)

To raise capital for KSpace, the Defendants utilized a structure involving a newly formed single-purpose entity referred to as an "investment vehicle."  (Id. 12-13.)  New investors would purchase membership interests in the "investment vehicle", which in turn would purchase membership interests in KSpace. (ECF No. 100-35.)  The first investment vehicle formed was Aspen KSpace, LLC, a Nevada limited liability company ("AKS-I").  AKS-I was managed by Aspen Pacific Asset Management, LLC ("APAM"), through its Manager, Defendant AP Group, and Defendant Cohen was President of same.  (ECF No. 98-9.)

On February 9, 2010, AKS-I purchased approximately 37% of the membership interests in KSpace for $1,590,000.  (*Id.* at 10.)  AKS-I also agreed to lend KSpace an additional $410,000, for a total of $2 million in new capital for KSpace.  (ECF No. 98-10;

ECF No. 98-11.)   As a part of the AKS-I transaction, Defendant AP Group received a 20% interest in AKS-I, forming part of the consideration for raising capital for the company, KSpace.  (ECF No. 98-3 at 30,33-34.)  Between February and June, 2010, Cohen and Young raised $2 million for KSpace from 15 separate investors in AKS-I, excluding Cohen's and Young's investments through their investment entities H&L Cohen, LLC and Young Investments, LLC.  (ECF No. 98-12.)

The $2 million that Cohen and Young raised through the first investment vehicle (AKS-I) turned out to be insufficient to finish development of KSpace's product.  (ECF No. 98-4 at 168.)   In September, 2010, KSpace authorized Cohen and Young to raise an additional $1 million, which later occurred through Plaintiff's investments.  (*Id.*)

For purposes of Plaintiff's investments, Defendant Cohen formed a second "investment vehicle", Aspen KSpace II, LLC ("AKS-II").  (ECF No. 98-13.)   Similar to AKS-I, this second investment vehicle was run through its manager, Defendant AP Group, which in turn was managed by Defendant Cohen.  (ECF No. 115-1 at 8.)

On November 22, 2010, the closing of the AKS-II financing transaction occurred, involving 21 separate instruments executed variously by Plaintiffs, KSpace and its members, AKS-I and its members, AKS-II and its members, AP Capital, and AP Group. (ECF No. 98-14.)

The AKS-II closing documents included the following:

(a) Subscription Agreements between Plaintiffs and AKS-II, under which Plaintiffs Landegger and Whittemore jointly paid $1 million for 80% of the membership interests in AKS-II (ECF No. 115-1; ECF No. 115-2.);

(b) Operating Agreement of AKS-II between and among Plaintiffs and AP Group,

in which AP Group acquired the remaining 20% interest in AKS-II (ECF No. 98-15);

(c) Preferred Membership Interest Purchase Agreement between KSpace and AKS-II, under which AKS-II agreed to purchase an 18.7% membership interest in KSpace for $795,000 (ECF No. 98-16);

(d) Amended and Restated Secured Note made by KSpace in favor of AKS-I and AKS-II in the amount of $615,000, in consideration of $205,000 newly loaned to KSpace by AKS-II and $410,000 previously loaned by AKS-I (ECF No. 98-17);

(e) Amended and Restated Security Agreement between and among Kspace, AKS-I, and AKS-II, in which KSpace pledged its assets to secure the Note (ECF No. 98-18);

(f) Participation Agreement and Assignment of Participation Interest between ASK-I and AKS-II, defining their relationship as co-lenders to KSpace (ECF No. 98-19);

(g) Action by Written Consent of the Manager of AKS-II (APAM, through its Manager, AP Group) and Members of AKS-II (Plaintiffs and AP Group), consenting to the financing transaction documents (ECF No. 98-21);

(h) Second Amended and Restated Operating Agreement of KSpace, signed by the members of KSpace to accommodate the new issue of KSpace membership interest to AKS-II (ECF No. 98-22);

(i) Action by Written Consent of the Management Committee and Members of KSpace, signed by KSpace and its members to consent to the AKS-II financing transaction documents (ECF No. 98-23); and

(j) Amended and Restated Consulting Agreement between KSpace and AP Capital, providing for increased fees to be paid by KSpace to AP Capital.  (ECF No. 98-

6

24).

According to Dr. Bazih, founder of KSpace, the Amended and Restated Consulting Agreement between KSpace and AP Capital was "believed" to have been executed as an integral part of the November 22, 2010, AKS-II transaction.  (ECF No. 98-1 at 83.)  Moreover, the appended schematic illustrates key aspects of the KSpace transactions, including the contracts between the investment vehicles, KSpace, some Defendant entities and Plaintiffs Landegger and the Whittemore Collection Ltd.  (*See* Exhibit A.)

The Court has relied upon this schematic as a reference point in the disposition of Defendant's Motion.  It is hardly, though, a model of clarity. To this point, the Court notes that supplemental briefing was recently sought in this case to update the case law that may have evolved since Defendants' Motion was originally filed in late December 2012.  (ECF No. 113.)  The Court also afforded Defendants an opportunity to provide the Court with its own schematic.  Defendants declined this invitation, which only reinforces the difficulty in conceptualizing the contractual relationships at issue in this suit and disputed issues of material fact going to the privity issues addressed later.

**C.     Relevant Statutory Sections of the Exchange Act**

The following provisions from the Exchange Act are relevant to the instant

Motion. Specifically, Section 15(a)(1) of the Exchange Act, provides:

> It **shall be <u>unlawful</u> for any broker or dealer** which is either a
> person other than a natural person or a natural person not associated with
> a broker or dealer which is a person other than a natural person (other
> than such a broker or dealer whose business is exclusively intrastate and
> who does not make use of any facility of a national securities exchange) to
> make use of the mails or any means or instrumentality of interstate
> commerce to effect any transactions in, or to induce or attempt to induce
> the purchase or sale of, any security (other than an exempted security or
> commercial paper, bankers' acceptances, or commercial bills) **unless
> such broker or dealer is registered** in accordance with subsection (b) of
> this section.[2] [3] (*emphasis added.*)

For unlawful violations of Section 15(a)(1) of the Exchange Act, Section 29(b)

further provides:

> Every **contract made in violation** of any provision of this chapter
> or of any rule or regulation thereunder, and every contract (including any
> contract for listing a security on an exchange) heretofore or hereafter
> made, the performance of which involves the violation of, or the
> continuance of any relationship or practice in violation of, any provision of
> this chapter or any rule or regulation thereunder, **shall be void** as regards
> the rights of any person who, in violation of any such provision, rule, or
> regulation, shall have made or engaged in the performance of any such
> contract[.][4]  (*emphasis added.*)

---

[2] 15 U.S.C. § 78o(c).

[3] Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c) provides: "No broker or
dealer shall make use of the mails or any means or instrumentality of interstate commerce to
effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security
(other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a
national securities exchange of which it is a member by means of any manipulative, deceptive,
or other fraudulent device or contrivance, and no municipal securities dealer shall make use of
the mails or any means or instrumentality of interstate commerce to effect any transaction in, or
to induce or attempt to induce the purchase or sale of, any municipal security by means of any
manipulative, deceptive, or other fraudulent device or contrivance."

[4]  15 U.S.C.A. § 78cc

**D.     Summary of Plaintiff's Claim and Issues before the Court**

The crux of Plaintiff's claim is predicated on the unregistered broker status of Defendants Cohen and Young, respectively.  Because of this status, Plaintiff contends that the securities' contracts entered into with Defendants were unlawful under Section 15(a)(1) of the Exchange Act.  Plaintiff further contends that the contracts should be made void pursuant to Section 29(b).

Arising from Plaintiff's claim are issues of first impression within the Tenth Circuit.[5]  They can be summarized as follows:

- First, whether Plaintiffs can assert an implied private cause of action under Section 15(a)(1) and Section 29(b) of the Exchange Act.

- Second, whether Plaintiffs are in privity with Defendants and can obtain rescission under Section 29(b) of the Exchange Act.

- Third, whether Plaintiffs can claim money damages under Section 29(b) of the Exchange Act.

Because Plaintiff has conceded the third issue, the Court does not address it in any significant way other than to say that Plaintiff will be prevented from pressing that argument at trial.[6]  (ECF No. 94 at 31.)

---

[5]  Even after the Parties filed supplemental briefing, both sides provided no conclusive Tenth Circuit authority on the first and second issues addressed above.  (ECF Nos.115; 116.)

[6]  While Plaintiff attempted to withdraw the original concession from previous briefing in ECF No. 116, the Court disregards this turnabout.  The purpose of the supplemental briefing was to assist the Court on any new relevant developments in the case law. Having conceded a position at his own volition, without any foul-play by Defendants, the Court finds it highly prejudicial to now permit renewal of the damages issue with trial soon approaching.  Plaintiff should have done his homework before conceding the damages issue, not after, and he is now estopped from reversing course on this issue at this late juncture of the proceedings.

## III. ANALYSIS

### A.   Whether Plaintiffs Can Assert an Implied Private Cause of Action Under Section 15(a)(1) and Section 29(b) of the Exchange Act

#### 1.    Definition: A Private Cause of Action: Express and Implied

A private right of action is the "right of an individual to bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement."[7]   *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 297 (3d Cir. 2007); *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (using the terms "private right of action" and "private cause of action" interchangeably in the same paragraph); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575-76, (1979) (same).  Many federal statutes provide a private cause of action through their express terms.  Other federal statutes, however, merely define rights and duties, and are silent on the issue of whether an individual may bring suit to enforce them.  For statutes in this latter category, as here, courts have held that "implied" private rights of action may exist subject to statutory interpretation.

#### 2.    The *Borak* and *Cort* Decisions

The methodology applied by the federal courts in determining the existence *vel non* of an implied cause of action has shifted in recent times.[8]  For reasons that will be

---

[7]  Over the past thirty years, the Supreme Court has taken different approaches to interpretation in deciding when to create private causes of action.  Commentators have readily stated that this issue is one of the more controversial areas of federal court jurisdiction because the issue relates to complex statutory construction, debates about the role of federal common law and separation of powers relevant to the roles of the Judiciary and Congress. *See generally* E. Chemerinsky, Federal Jurisdiction (5th ed. 2007).

[8]  No consensus exists regarding when the Supreme Court "first began recognizing implied private rights of action under federal statutes."  *Wisniewski*, 510 F.3d at 297. It would seem that the "earliest" case recognizing an implied private right of action was *Texas & Pacific*

addressed later, this context is important to the Court's reasoning, because it illustrates the state of the law when the Exchange Act was amended, which is relevant to the private cause of action analysis addressed later.

The Court begins its review with examination of *J.I. Case Co. v. Borak,* 377 U.S. 426 (1964). The issue in *Borak* was whether a shareholder had a private cause of action for damages for violation of §14(a) of the Exchange Act; a section that makes it "unlawful for a person to solicit proxies in violation of rules prescribed by the Securities and Exchange Commission." *Id.* (emphasis added). Finding that the SEC did not have enough time to examine every proxy statement for false and misleading statements, the Supreme Court stated that private enforcement is a "necessary supplement" to the SEC's efforts to protect investors. *Id.* at 432-33. This, the Supreme Court said, was to conform with and effectuate the broader purposes of the Exchange Act—*i.e.*, "the protection of investors" engaged in the buying and sale of interstate securities. But as recently pointed out in *Wisniewski*, 510 F.3d at 297, at no point did the *Borak* Court purport to "discern Congress's intent regarding a private right of action as opposed to Congress's general purposes in enacting the statute." As such, the *Borak* approach is viewed as the *least* restrictive approach in determining whether a private cause of action may be discerned from a statute. *Id.*

Eleven years after *Borak*, in *Cort v. Ash*, 422 U.S. 66, 78 (1975), the Supreme Court shifted its approach in attempting to discern the existence of a private cause of action where the relevant statute was silent on the matter. In making this determination,

---

*Railway Co. v. Rigsby*, 241 U.S. 33, 39 (1916) (holding that the Federal Safety Appliance acts provided an implied private right of action to an injured railroad employee against his employer.)

the Supreme Court described the criteria to be applied by the lower courts as follows: "First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted' -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Id.*

In applying the criteria, the Supreme Court found a private civil cause of action did not exist under a criminal statute prohibiting corporations from making contributions to presidential campaigns. *Id.*  Importantly to our analysis here, notwithstanding the shift in approach the Court employed in *Cort*, the four-factor test enunciated in that decision has itself since been 'chipped away' with subsequent decisions altering the test virtually beyond recognition.[9]  *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979).  It is to this latter case, among others, that the Court next turns.

---

[9]  Justice Scalia observed in a 1988 concurrence that *Cort's* analysis was "effectively overruled" by later Supreme Court opinions. *See Thompson v. Thompson*, 484 U.S. 174, 188, 108 S.Ct. 513, 98 L.Ed.2d 512 (Scalia, J., concurring).  *See also Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (stating that "cases subsequent to *Cort v. Ash* have plainly stated that our focus must be on "the intent of Congress.")

3.      The *Touche, Curran* and *Huddleston* Decisions

In *Touche*, the Supreme Court addressed whether § 17(a) of the Exchange Act afforded a private right of action against a broker who did not submit periodic reports to enable the relevant authorities to perform their regulatory functions.  The plaintiff argued that because the defendant-broker failed in this duty, this gave rise to damages on a tort-based theory of liability.  In rejecting that theory, the Supreme Court declared that the task of the court was "limited solely to whether Congress intended to create the private right of action."  *Touche* 442 U.S. at 568.  In finding that the section did not evince a Congressional intent to create a private right of action, Justice Rehnquist stated:

> Here, the statute by its terms, grants **no private rights to any identifiable class** and **proscribes no conduct as unlawful**.  And the parties as well as the Court of Appeals agree that the legislative history of the 1934 Act simply does not speak to the issue of private remedies under § 17(a).  At least in such a case as this, the inquiry ends there: The question whether Congress, either expressly or by implication, intended to create a private right of action, has been definitely answered in the negative.

> *Id.*(*emphasis added*).

The Supreme Court held in the negative on the question before us because the text and structure of the statute did not protect an identifiable class, nor proscribe conduct that was unlawful. *Id.*  Given the heavy endorsement of the *Touche* holding by subsequent decisions — including decisions in the Tenth Circuit[10]—this reasoning

---

[10]  *See Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1267 (10th Cir. 2004) (mirroring the language in *Touche*, and stating that "[o]ur task is to determine whether the FMLA displays an intent to create both a right and a remedy in favor of Plaintiffs.); *Southwest Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1169 (10th Cir. 2001) (discussing *Cort* and *Touche* ); *Sonnenfeld v. City & County of Denver*, 100 F.3d 744, 747 (10th Cir. 1996) (stating "Now, *Cort's*

provides *clues* to elucidate Congressional intent for the purposes of determining when statutory language gives rise to a private cause of action.  As will become evident later, such clues are crucial to the Court's disposition of Defendant's Motion in this case.

The High Court's next case on this issue, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982), is also relevant to disposition of Defendants' Motion.  Here, the Supreme Court implied a private cause of action under the Commodities Futures Trading Commission Act ("Commodities Act"), *after* Congress amended the Commodities Act in 1974.  The Court reasoned that it was "simply assumed the remedy was available" and that Congress's failure to eliminate the statutory provisions from the previous act—which afforded a private cause of action—only justified the maintenance of the enforcement scheme under the amended Act.  *See Curran*, 456 U.S. at 377.  Congress's failure to eliminate the private cause of action in the amended Commodities Act reflected "the intent of Congress" to maintain a private cause of action.  *Id.*

Tellingly, and relevant to the present case, the majority held that a court's "evaluation of congressional action must take into account [the] contemporary legal context." *Id.*  The relevant context in *Curran* was one where courts had previously

---

four factors have been effectively condensed into one-whether Congress expressly or by implication, intended to create a private cause of action."); *see also Davis-Warren Auctioneers, J.V. v. Federal Deposit Ins. Corp.*, 215 F.3d 1159, 1162 (10th Cir. 2000) ("To decide whether a private right of action is implicit in a statute, we must determine 'whether Congress, expressly or by implication, intended to create a private cause of action.' ") (*quoting Sonnenfeld*, 100 F.3d at 747); *Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1493 (10th Cir. 1997) ("In determining whether an implied private right of action exists under a particular statute, the focus is solely on congressional intent."); *L'ggrke v. Benkula*, 966 F.2d 1346, 1347 (10th Cir. 1992); *Shoultz v. Monfort of Colorado, Inc.*, 754 F.2d 318, 323 (10th Cir.1985), cert. denied, 475 U.S. 1044 (1986) ("The Court has ... 'plainly stated that our focus must be on the intent of Congress.' ") (quoting *Curran*, 456 U.S. at  377).

recognized a private cause of action under the previous statute.  It was this context that

clarified Congressional intent to allow for private rights of action under the Commodities

Act.[11]  456 U.S. at 377 n.100 (stating that "[i]t is just as much 'judicial legislation' for a

court to withdraw a remedy which Congress expected to be continued as to improvise

one that Congress never had in mind.")

On the heels of *Curran* came *Herman & MacLean v. Huddleston*, 459 U.S. 375,

387 (1983).  There, the Supreme Court affirmed the existence of an implied private

cause of action based on §10(b) of the Exchange Act.  Specifically, the Supreme Court

said:  "a private right of action under Section 10(b) of the 1934 Act and Rule 10b-5 has

been consistently recognized for more than 35 years. The existence of this implied

remedy is simply beyond peradventure." *Id.* at 381.  Citing *Curran*, and in construing the

statute, it was further stated that "Congress's decision to leave Section 10(b) intact

[from the previous statute] suggests that Congress ratified the cumulative nature of the

---

[11]  *See also Cannon*, 441 U.S. at 696-99. In that case, the Supreme Court implied a private right of action under Title IX of the Education Amendments of 1972 because the statute was enacted prior to *Cort*.  The *Cannon* Court stated it was appropriate and realistic to "take into account [the] contemporary legal context" in determining whether the Congress that had enacted the statute intended to create a private right of action. *Id.* In *Cannon*, the plaintiff contended that a medical school receiving federal financial assistance had rejected her application for admission based on her gender in violation of Title IX. *Id.* While it stated it would normally "adhere to the strict approach followed in . . . recent cases," the Court concluded that its "evaluation of congressional action in 1972 must take into account its contemporary legal context." *Id.* And in deciding that a private cause of action could be implied under Title IX, the Court stressed that the Congress that had enacted Title IX was aware of several lower court decisions that had already recognized an implied private right of action under Title VI of the Civil Rights Act of 1964, which contains language similar to the language of Title IX. *Id.* The Court stated: "The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." *Id.  See also*, Bradford C. Mank, *Legal Context: Reading Statutes in Light of Prevailing Legal Precedent*, 34 Ariz. St. L.J. 815, 835-36 (2002) (providing detailed analysis of this case and the line of cases that have addressed private causes of action between 1964 and 1972, the Supreme Court in six cases had found implied private rights of action in statutes that contained no explicit evidence of such remedies.

Section 10(b) action." *Id.* at 386.

The *Curran* and *Huddleston* cases share in common the fact that the Court was continuing to imply previously existing causes of action, rather than creating new ones. Indeed, in the period in which the Commodities Act and the Exchange Act were amended, the Supreme Court was guided by the *Borak* decision; a decision that provided the least restrictive approach in allowing implied private causes of action. This provided further legal context that allowed the majority in *Curran* (and *Huddleston)* to more readily infer Congressional intent from the amended statutes in each case because Congress expected that the courts would to follow the *Borak* approach. This view was reinforced by the Supreme Court's earlier decision in *Cannon*, where it was stated, as a general proposition, that it is reasonable to presume that Congress is aware of judicial precedent before enacting statutes, and that it is appropriate for courts to consider such contextual evidence for purposes of construing a statute. *Cannon* 441 U.S. at 677 (stating, "it is always appropriate to assume that our elected representatives, like other citizens, know the law" at the time of making amendments to existing statutes).

    4.   The *Sandoval* Decision

The Supreme Court's most recent treatment of the private cause of action issue can be found in *Sandoval*, 532 U.S. 275. It is the most restrictive approach announced by the Court to date. The issue before the Court was whether an implied cause of action existed to enforce the regulations enacted under Title VI of the Civil Rights Act of 1964. Title VI prohibits racial discrimination by recipients of federal funds. Although Title VI had traditionally required discriminatory intent, the Department of Justice

("DOJ") enacted regulations under Title VI that prohibited recipients of federal funds from engaging in practices that have a racially discriminatory impact. The Court reviewed these regulations, coupled with the statute that, pre-*Sandoval*, had been interpreted by every court of appeals as providing for a private cause of action to enforce the DOJ's regulations.

Notwithstanding this, the Court's majority rejected the opinion of every circuit court[12] to address this issue, finding that Title VI did not provide for a civil cause of action because there was simply nothing in the text or structure of the statute to support the creation of a private right. *See* 532 U.S. 275 (stating "[w]e therefore begin (and find that we can end) our search for Congress's intent with the text and structure of Title VI.") The majority further reasoned that: "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is

_____

[12] Prior to the Supreme Court's *Sandoval* decision, every court of appeals to address the issue, including the Eleventh Circuit in the case below, had recognized that citizens have a private right of action under § 602 of Title VI to enforce agency regulations prohibiting disparate impact discrimination against recipients of federal aid. *See  Sandoval v. Hagan*, 197 F.3d 484, 502-07 (11th Cir. 1999), *rev'd,* 532 U.S. 275 (2001); *Powell v. Ridge*, 189 F.3d 387, 399-400 (3rd Cir. 1999) (holding there is private right of action under § 602 of Title VI to enforce disparate impact regulations), cert. denied, 528 U.S. 1046 (1999); *Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir. 1996) *(citing Guardians*, court stated that, "[a]lthough Title VI itself proscribes only intentional discrimination, certain regulations promulgated pursuant to Title VI prohibit actions that have a disparate impact on groups protected by the act, even in the absence of discriminatory intent."); *New York Urban League Inc., v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995) (citing *Guardians and Alexander v. Choate*, 469 U.S. 287, 293 & nn. 8-9 and allowing plaintiffs to file a disparate impact claim under Title VI's regulations); *City of Chicago v. Lindley*, 66 F.3d 819, 827-28 (7th Cir. 1995) (citing *Guardians and Alexander*, court recognized private cause of action for disparate impact discrimination under Title VI's regulations); *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1406-07 (11th Cir. 1993) (citing *Guardians* and *Alexande*r, the court upheld district court's disparate impacts interpretation of Department of Education's Title VI regulations); *United States v. Lulac*, 793 F.2d 636, 648-49 & n.34 (5th Cir. 1986) (*citing Guardians* and allowing plaintiffs to seek equitable relief for disparate impact claim under both Title VI and its regulations); *Larry P. v. Riles*, 793 F.2d 969, 981-82 (9th Cir. 1984).

to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." 532 U.S. at 286.  In affirming this textualist approach, the majority further stated (1) that the approach in *Borak* had been "abandoned" and (2) that the approach in *Curran*—which looked to contemporary legal context—had only been applied in handful of "implied-right-of-action cases" and did not hold "dispositive weight" in determination of the Congressional intent. 532 U.S. at 287.  With respect to (2), the majority declared that application of "contemporary legal context" may only "buttress a "conclusion supported by the text and structure" of the statute.  *Id.* The majority concluded that "[contemporary]  legal context *matters only* to the extent it *clarifies* text." *Id. (*emphasis added*).*

Finally, in re-calibrating the approach relevant to implied causes of action, the majority in *Sandoval* relied heavily on the *Touche* decision to buttress its reasoning—a case which was cited no less than four times throughout Justice Scalia's opinion.  Given the endorsement of the *Touche* holding by *Sandoval*, and the subsequent citation of same by the Tenth Circuit, the Court finds the *Touche* decision useful in disposition of the present case, especially given that is one which similarly addressed provisions in the Exchange Act.

   5.    The State of the Law: Summary of the Interpretive Process

To summarize, the *Sandoval* decision resoundingly affirmed *Touche.*  532 U.S. at 286 (stating, "private rights of action to enforce federal law must be created by Congress").  In accordance with *Sandoval*, the judicial task is to "interpret the statute to determine whether it displays *an intent to create not just a private right, but also a private remedy*." *Id.*  Such intent must be drawn from the "text and structure" of the

18

statute to determine whether "rights-creating language" exists.  *Id.* at 288.  And to determine whether such language exists, *Touche* provides that district courts are to look to the whether the statute (1) grants "private rights to any identifiable class" and (2) "proscribes conduct as unlawful."  442 U.S. at 568.  These are but examples of "rights-creating language"; though given the strong endorsement of *Touche* in *Sandoval*, these examples provide helpful *clues* as to whether Congress intended that a private cause of action be implied.  If there is no "rights-creating language", *Sandoval* makes clear that the interpretive process ends there.  *Sandoval* 532 U.S. at 288.

Additionally, and to clarify the language of the statute—so to discern Congressional intent—*Sandoval* permits a district court look to the "contemporary legal context" in which the statute was enacted.  *Id.*  But the majority did restrict its usage. Context may only buttress a "conclusion independently supported by the text of the statute." *Id.*  Context cannot be relied upon as the first tool in the interpretive tool box.  It is secondary indicia of Congressional intent.  The weight afforded to context is thus less than that afforded to the statutory language itself.  532 U.S. at 292 (stating "legal context matters only to the extent it clarifies text.")

The approach summarized above is drawn directly from the *Sandoval* and *Touche* decisions.  It is an approach that will be applied by this Court, in this case, with respect to the relevant provisions in the Exchange Act.  *See Boswell v. Skywest Airlines*, Inc., 361 F.3d 1263, 1267 (10th Cir. 2004); *Southwest Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1169 (10th Cir. 2001); *Sonnenfeld*, 100 F.3d at 747; *see* Bradford C. Mank, *Legal Context: Reading Statutes in Light of Prevailing Legal Precedent*, 34 Ariz. St. L.J. 815, 835-36 (2002).

19

6.      Parties' Argument and Application of Interpretive Principles to the Instant Case

 The battle lines drawn over interpretation are primarily directed at Section 15(a)(1) and Section 29(b). The Parties have competing interpretations of how these provisions should be construed—and whether, *inter alia*, the provisions give rise to a private cause of action as a matter of law.

Plaintiff contends that Defendants have violated Section 15(a)(1) of the Exchange Act.  That section provides that it is unlawful for a broker to induce the sale of securities unless registered.  Section 29(b) affords relief for violations of Section 15(a)(1) in the form of rescission.  Plaintiff's preferred interpretation is that these provisions give rise to an implied private cause of action.

Defendants counter. They contend that neither of the sections afford Plaintiff any form of private action.  Rather, Defendants' preferred construction is that any action based on Section 15(a)(1) and Section 29 must be brought by the Securities and Exchange Commission ("SEC" or "Commission").  (ECF No. 115 at 12-13.)  Defendants rely heavily on *Sheldon v. Vermonty*, 204 F.R.D. 679 (D. Kan. 2001).

For the reasons stated below, the Court adopts Plaintiff's preferred construction. The reason is four-fold.

*First*, Section 15(a)(1) provides 'rights-creating language' that discerns Congressional intent in favor of Plaintiff's position.  The Court finds that such language gives rise to a private cause of action under the Exchange Act.  Specifically, Section 15(a)(1) provides that "it shall be *unlawful* for any broker. . . . to effect . . . the purchase or sale of, any security  . . . unless such broker is registered."  The Court finds that this

text provides clear evidence of Congressional intent to support Plaintiff's private cause of action against Defendants under the Exchange Act.  It does so because Section 15(a)(1) proscribes certain conduct as "unlawful"—*i.e.*, it is unlawful for brokers to engage in the sales of securities when they are unregistered.  It is rights-creating language since it allows a plaintiff to sue for violations of a broker's unlawful conduct connected with the sale of securities contracts.  *Cf. Touche* 442 U.S. at 568 (finding that "the statute by its terms, grants no private rights to any identifiable class and proscribes no conduct as unlawful. . . [a]t least in such a case as this, the inquiry ends there. . . and the question whether Congress intended to create a private right of action, [is] answered in the negative.")

Because Section 15(a)(1) expressly states that unregistered brokering is *unlawful*, the Court finds that this language provides one of the best clues that the section affords a private cause of action reflecting Congressional intent.  Put simply: the *absence* of this language in *Touche* cut against the plaintiff in that case; it follows that the *existence* of this language, in *this* case, cuts the other way.[13]   Relatedly, Section 15(a)'s language also narrows and identifies a class of plaintiffs for this putative cause of action—*i.e.*, a class of plaintiffs who purchase securities from unregistered brokers. *Touche,* 442 U.S. at 568.  The language does not connote a torts-based theory of

---

[13]  The Court observes that while the methodology applied in *Borak*, 377 U.S. at 426 is no longer good law, the Court ultimately found that violation of §14(a) of the Exchange Act afforded a private cause of action; a section that makes it "*unlawful* for a person to solicit proxies in violation of rules prescribed by the Securities and Exchange Commission." (emphasis added).  Given that §14 used "rights-creating" language that was identified in *Touche,* it would follow that Supreme Court would have come to the same result had that same section be adjudicated under the more restrictive approach in *Sandoval* (which adopted *Touche*).

relief—which was rejected in *Touche*; rather, the language creates relief based on *contract*, making the class of plaintiffs more defined and significantly mitigating any floodgates concerns that typically arise in a tort-based context. *Id.*

*Second*, *Sandoval* mandates more than just a private right—there must also be Congressional intent to create a private remedy.  Here, evidence of a private remedy can be found in Section 29(b).  That section provides that "*every* contract made in violation of this chapter . . . shall be void." (emphasis added).  And because Section 15(a)(1) falls within the chapter that triggers relief under Section 29(b), it follows that the *Sandoval* requirement that there be textual and structural support for both a personal right and a private remedy is satisfied.  *Cf. Boswell, Inc.*, 361 F.3d at 1267 (stating that the court's task "is to determine whether the [statute] displays an intent to create both a right and a remedy in favor of plaintiff.")

As such, because *Sandoval*'s methodology yields a result in favor of Plaintiff's preferred construction, this alone is enough to end the debate since the text and structure evidences Congressional intent that a private cause of action exists pursuant to Section 15(a)(1) and Section 29(b), respectively.  *See Sandoval*, 532 U.S. at 286 (stating that the "interpretive inquiry begins with the text and structure of the statute").

The *third* reason supporting Plaintiff's preferred construction is based on context. It serves to reinforce the result against Defendants' purported construction.

To supplement the text and structure of a statute, *Sandoval* said that a court could look to "contemporary legal context" to discern Congressional intent provided such context acts in tandem with the statutory language.  *See* 532 U.S. at 292. Specifically, *Sandoval* stated that context may buttress a "conclusion independently

supported by the text and structure of the statute." *Id.*  The text must speak first,

however.  Here, Plaintiff contends that the legal context, at the time of amendment to

the Exchange Act in 1975, also supports Plaintiff's preferred construction.  *Id.*  As

Plaintiff points out that prior to 1975 a private cause of action *had* been recognized by

some courts under Section 15:  *see Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365,

368 n.1 (1st Cir. 1973), *Davis v. Avco Corp.*, 371 F. Supp. 782, 789 (N.D. Ohio 1974),

and *Opper v. Hancock Securities Corp.*, 367 F.2d 157, 158 (2nd Cir. 1966).[14]

Because of these cases, Plaintiff contends that the contemporary legal context

allows this Court to more readily infer Congressional intent supporting a private cause of

action since Congress's failure to expressly eliminate the private cause of action in the

amended Act reflected the intent of Congress to maintain a private cause of action

under the statute, post-1975.[15]  *See Curran*, 456 U.S. at 377.

This argument holds merit. In light of the referenced pre-1975 case law—coupled

with the intention drawn from the text and structure of the statute as addressed

above—the Court agrees with Plaintiff's preferred construction.  The Court finds that the

---

[14]  Defendants do not challenge these authorities, nor the context that is afforded in these cases that indicated that a private cause of action existed under Section 15(a)(1)'s analogue before the amended statute was enacted. Because Defendants provide no authority to rebut this point, Defendants forfeit same. *See Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir.1992) (stating "a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.")

[15]  While *Curran* was also cited several times by the majority, the Court only did so to criticize the holding, stating that "*Curran's* reliance on congressional inaction [to determine Congressional intent . . . deserves little weight in the interpretive process." 532 U.S. at 293. Notwithstanding this, the majority did not goes as far as *rejecting Curran's* approach altogether (as it did with *Borak*).  This tends to suggest that *Curran* remains good law in clarifying Congressional intent provided that such intent is first drawn from the text and structure of the statute.

legal context, at the time of the amendment to the Exchange Act, supports the contention that it was Congress's intent to provide for a private cause of action, because there is nothing in the express language of Section 15(a)(1) to disavow this interpretation, particularly given the pre-existing case law that supported its existence. This view, however, is qualified to the extent the Court has afforded less weight to context than that afforded to the text and structure of the statute. This is what *Sandoval* mandates. But, provided such context is not inconsistent with the text, as here, context can serve to buttress the text and structure of the statute to better demonstrate Congressional intent giving rise to a private cause of action. The Court finds as much. *See Sandoval*, 532 U.S. at 287-292.[16]

*Finally*, Defendants rely on *Sheldon* for the proposition that private cause of action under Section 15(a)(1) has not been recognized since the amendment of the Exchange Act in 1975. 204 F.R.D. 679. Defendants contend that this Court should follow that opinion. But fatal flaws exist in *Sheldon's* reasoning. For instance, there is

---

[16] It is worth noting that the *Sandoval* and *Curran* cases work together to fortify the Court's adoption of Plaintiff's statutory construction—a construction that recognizes the existence of a private cause of action under Section 15(a)(1) and Section 29(b) of the Exchange Act. Indeed, the construction that the Court adopts follows a line of other cases where private causes of action have previously been recognized which further support the conclusion drawn in this case. *See Curran* 456 U.S. at 377 n. 100 (stating that "[i]t is just as much 'judicial legislation' for a court to withdraw a remedy which Congress expected to be continued as to improvise one that Congress never had in mind"); *Cannon*, 441 U.S. at 696-99; *Huddleston*, 459 U.S. 375, 387 (recognizing a private cause of action pursuant to Section 10(b) of the 1934 Act and Rule 10b-5 because courts had done so for 35 years before amendment to the Exchange Act); *Sonnenfeld*, 100 F.3d at 747 (*citing Curran* and holding that an implied right of action under § 10(b) existed against municipality and stating that "had Congress intended there be no private cause of action against municipalities, it expressly would have stated such an exemption); *see also* Bradford C. Mank, *Legal Context: Reading Statutes in Light of Prevailing Legal Precedent*, 34 Ariz. St. L.J. 815 (2002) (providing detailed analysis of this case and the line of cases that have addressed private causes of action).

no reference to *Sandoval* anywhere in the opinion.  On the contrary, there are at least four references to the *Cort* decision; a decision that has been virtually altered beyond recognition from a four-factor test to a one factor analysis: Congressional intent. Moreover, nowhere in *Sheldon* opinion did that court seriously examine the application of *Curran*—*i.e.*, an approach that allows for analysis of contemporary legal context to help clarify Congressional intent as a basis for implying a private cause of action. Instead, it was simply ignored and reliance was placed on *Cort* and cases citing same, even though there were Supreme Court cases in the late 1970s, post-*Cort*, that cut away at its persuasiveness. This has been addressed earlier.

The Court finds that both *Sandoval* and *Curran* are directly relevant to the analysis in the present suit.  The fact that they were both absent in the abbreviated analysis in *Sheldon* dilutes any persuasive value of that opinion in this district.  Indeed, because *Sheldon* cites neither case, this Court affords the decision minimal (if any) weight in disposition of Defendants' Motion.

In sum, the Court finds that Congress has adequately evinced—through the text and structure of the relevant statutory language—its intent to afford a private cause of action pursuant to Section 15(a)(1).  As a matter of law, therefore, the Court finds that Defendants' motion should be denied to the extent that it relates to the first issue—*i.e.*, whether Plaintiff may pursue a private cause of action against Defendants.

**B.     Whether Plaintiffs are in Privity with Defendants and Can Obtain Rescission under Section 29(b) of the Exchange Act**

The second issue addresses whether privity of contract is required to maintain relief pursuant to Section 29(b) of the Exchange Act.  In deciding this issue, the Court notes in advance that Plaintiff has certain built-in advantages in the context of summary judgment.  Plaintiff need not prove that privity exists at this juncture; Plaintiff need only establish that there is a genuine dispute as to material facts going to the privity issue.  It is because the burden only extends this far (at this juncture) that Plaintiff is aided in rebutting Defendants' Motion for Summary Judgment.  *See Allen*, 119 F.3d at 839; *Adler,* 144 F.3d at 670 (stating that in analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party);  *Houston*, 817 F.2d at 85 (stating that court must resolve factual ambiguities against the moving party, thus favoring the right to a trial).

1.     Parties' Arguments and Analysis

To prevail under Section 29(b), a plaintiff must show: "(1) the contract involved a 'prohibited transaction;' (2) he is in contractual privity with the defendant; and (3) he is 'in the class of persons the Act was designed to protect.'" *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982); *Berkeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006); *see also Heck v. Buehler*, 2010 WL 1293752, at *7 (M.D. La. Mar. 3, 2010).[17]  In addressing element (2), courts have used a

---

[17]   The real battleground in this case is over element (2).  The other elements were not put into dispute  Further, as of September 4, 2013, the Parties indicated in their supplemental briefing that they did not find any recent case law, since the time of the Parties' initial briefs in late 2012, that addressed the required elements for a plaintiff to prevail on a Section 29(b) claim.  (ECF No. 115; ECF No. 116.)

broad brush and asked whether a name-defendant is a "stranger to the contract." *Natkin v. Exchange Nat'l Bank of Chicago*, 342 F.2d 675 (7th Cir. 1965).

Defendants contend that even if Plaintiff has a claim under Section 15(a)(1), he cannot claim relief in the form of rescission because Plaintiff cannot establish privity of contract. (ECF No. 115 at 3.) Plaintiff counters. At a minimum, Plaintiff argues that privity exists with respect to Defendant AP Group, and that a more flexible theory of privity should extend to the remaining Defendants because these Defendants cannot be said to be strangers to the securities contracts surrounding Plaintiff's investments. (ECF No. 116 at 41) (stating that the "citadel of privity" surrounding section 29(b) should not be followed "blindly"). Specifically, Plaintiff contends that the contracts "are mere strands in a complex web of interrelation agreements that form a single transaction" that satisfy the privity requirement for the purposes of obtaining the relief sought pursuant to Section 29(b) of the Exchange Act. (*Id.* at 2.) [18]

### a.    *Privity with Respect to Defendant AP Group*

In reading the following facts in favor of the non-moving party, the Court finds that there is enough disputed facts, at least at this juncture, to allow the Federal Claim to proceed to trial against Defendant AP Group. The following facts provide the

---

[18] Plaintiff should note that this Court will not eviscerate the privity requirement as it serves an important connection in ensuring that the Section 15(a)(1)-Section 29(b) private cause of action is not indeterminate. The Court has addressed this earlier in the Order; but to summarize here, a privity requirement is important to mitigate against any floodgates concerns because contract theory does much to narrow the class of potential applicants to such a claim. Therefore, Plaintiff (nor the Court) cannot go so far as to reject the privity requirement because doing so would tend to weaken the reasoning that supports the private cause of action analysis in Section III.A at 20-22 (stating that the language in Section 15(a)(1) "creates relief based on contract, making the class of plaintiffs more defined and significantly mitigating any floodgates concerns that typically arise in a tort-based context").

predicate for the Court's reasoning:

- On November 22, 2010, the closing of the AKS-II financing transaction occurred, involving 21 separate instruments executed variously by Plaintiffs, KSpace and its members, AKS-I and its members, AKS-II and its members, AP Capital, and AP Group. (ECF No. 98-14.)

- For purposes of Plaintiff's investments, Defendant Cohen formed a second "investment vehicle", Aspen KSpace II, LLC ("AKS-II").  (ECF No. 98-13.)   Similar to AKS-I, this second investment vehicle was run through its manager, Defendant AP Group, which in turn was managed by Defendant Cohen.

- It was Defendant Cohen, on behalf of AP Group, that, *inter alia*, signed the Operating Agreement (ECF No. 98-15), the Written Consent Agreement (ECF no. 99-6), and the Subscription Agreement  (ECF No. 115-1 at 8).

Of these agreements, the Operating Agreement is worth closer attention.  It puts in dispute Defendants' contention that no privity exists between Plaintiff and *any* of the Defendant entities because the Operating Agreement specifically binds both Plaintiff and Defendant AP Group with respect to units in AKS-II.  (ECF No. 98-15 at 18-33.)  It also outlines how the units will be managed, what voting rights members will have with respect units bought, how members and units may be added.  (*Id.* at 18-33.)  In Schedule A, the Operating Agreement references the cash contributions[19] of Plaintiffs

---

[19]  The Court does *not* intend to signal that it affirmatively finds that there is privity because of the Operating Agreement.  All that the Operating Agreement provides, at this juncture, is evidence beyond the pleadings that privity could well exist after jury consideration of this material facts.  The jury could also find that the intent of the Operating Agreement was

and Defendant AP Group to AKS-II, respectively.  (*Id.* at 42.)  In the remaining

Schedules to the Operating Agreement, there is extensive cross-referencing to other

agreements that were signed by the Parties surrounding the investment and operation

of AKS-II.  (*Id.* at 43-48.)

       In light of this evidence, the Court finds that Plaintiff has discharged his burden

for the purposes of summary judgment in going beyond the pleadings and setting forth

"specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant." *See Adler*, 144 F.3d at 671.  Thus,

because of this evidence, the Court finds that there is a genuine dispute of fact as to

whether Plaintiff is in privity of contract with Defendant AP Group so to deny

Defendant's Motion for Summary Judgment.  *See In re Gas Reclamation, Inc. Securities*

*Litigation*, 733 F.Supp. 713, 733 (S.D.N.Y. 1990); *see also Salamon v. Teleplus*

*Enterprises, Inc.*, 2008 WL 2277094, *6 (D.N.J. 2008).

               *b.*    *Privity with Respect to the Remaining Defendants*

       The question whether the other named-Defendants are in privity of contract with

Plaintiff is a much closer call.  In essence, Plaintiff's privity theory as applied to the

remaining Defendants is dependant upon a flexible approach to the doctrine.  Plaintiff

contends (1) that privity can drawn from the interrelated nature of the contracts, and (2)

because of the interrelated nature of the contracts, Plaintiff is not a "stranger to any

--------------------------------

meant to be read with other contracts so to form a single transaction for privity purposes. This
provides further basis for denial of Defendants' Motion for Summary Judgment.  Moreover, and
as Defendants readily acknowledge, the analysis required to determine whether something is a
'security' is factual and complex.  This only tends to show the there are disputed factual issues
that can only be reconciled by jury determination.  (ECF No. 115 at 18.)

contractual relationship with Defendants" and that privity exists. (ECF No.116 at 43.)

Plaintiff cites case law from contexts outside Section 29(b) that provide support

his position.  Plaintiff contends that there is enough in these cases for his privity theory

to proceed to jury for further factual development to determine whether privity exists.[20]

*See Bailey v. Hannibal & St. Joseph R.R. Co.*, 84 U.S. 96, 108 (1872) (stating in a

securities case in the Nineteenth Century that "it is well-settled law that several writings

executed between the same parties substantially at the same time and relating to the

same subject-matter may be read together as forming parts of one transaction"); *ARW*

*Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) (holding that a dispute

arising out of an agreement that lacked an arbitration clause was still subject to

arbitration based on the broad arbitration provision contained in other agreements

relating to the same joint venture); *Safer v. Nelson Financial Group, Inc.*, 422 F.3d 289,

296 (5th Cir. 2005) (stating that "[i[n determining whether two agreements are related, 'it

is well-settled that several writings executed by the same parties substantially at the

same time and relating to the same subject-matter may be read together as forming the

---

[20]  *See, e.g., BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 72-73 (Colo. 2004) ("The policies underlying the application of the economic loss rule to commercial parties are unaffected by the absence of a one-to-one contract relationship. Contractual duties arise just as surely from networks of interrelated contracts as from two-party agreements"); *Farmers Group, Inc. v. Trimble*, 768 P.2d 1243, 1247 (Colo. App. 1988) (stating that "[u]nder these circumstances, strict adherence to the general rule that liability for bad faith breach may be imposed only against a party to an insurance contract would permit Farmers to shield itself from liability through the device of a management company and would deny defendant recovery from the party primarily responsible for his damages"); *see also* Richard A. Lord, Williston on Contracts § 30:26 (4th ed. 1999) ("[I]nstruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other."

parts of one transaction").

Here, and based on the above cases combined with the evidence in the record, the Court finds that Plaintiff's argument has merit.  Specifically, because there is evidence in the record that Defendant AP Group signed contracts with Plaintiff which cross-references contracts with other Parties in the Schedules of that agreement, the Court finds that privity could exist with further factual development in the course of a jury trial.  To add to this, Defendant Cohen's signature exists on many of these contracts, and that tends to show that a reasonable juror might may make factual determinations which support a finding of privity with respect to the remaining Defendants.  What reinforces this view is the web of contracts that were all signed on the very same day (November 22, 2010) by the Parties as depicted in Exhibit A of this Order.  Indeed, this schematic is one that gives rise to an inference that Parties' intended that the contracts (or at least some of them) be read together as a single transaction.[21]  *Adler,* 144 F.3d at 670 (stating that a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party).

---

[21]  Some of these contracts signed on November 22, 2010 involved amendments to pre-existing contracts that involved Defendants from earlier funding rounds.  These include, for example, the earlier Consulting Agreement referred to in the Affidavit of George F. Landegger. See ECF No. 99-10.  In this evidence, Plaintiff states that among the transactional documents provided to him by counsel for Kspace-II was an Amended and Restated Consulting Agreement dated November 22, 2010, between KSpace-CA and Aspen Pacific Capital, Inc. ("AP Capital"). Plaintiff refers to the introductory paragraph of this Amended and Restated Consulting Agreement stating that on February 9, 2010, KSpace-I assigned to AP Capital the Consulting Agreement dated February 8, 2010. Under this Amended and Restated Consulting Agreement, AP Capital was entitled to an Initial Fee of $240,000, of which $80,000 was payable no later than the closing of the new financing of KSpace-CA by Kspace-II.

The Court notes that this evidence and cross-referencing of contracts in November 2010 with those in February 2010 involving multiple Defendant-entities only creates further disputed facts related to the Parties intent as to whether the contracts constituted a single transaction or not.

The Court holds that this evidence—and inferences that arise therefrom—suggest that the Federal Claim is anything but clear-cut.   Indeed, the claim will hinge on the interdependence of the 21 instruments dated November 22, 2010 (and possibly earlier contracts).   The Parties' *intent* underlying these instruments will in turn depend on questions of disputed fact.   And because *intent* is a factual determination, the Court has little choice but to allow Plaintiff's Federal Claim to proceed to trial and deny Defendants' Motion for Summary Judgment.[22] *See National Fire Ins. Co. v. Turtur*, 892 F.2d 199, 204 (2d Cir.1989)  (*quoting Lowell v. Twin Disc*, Inc., 527 F.2d 767, 769–70 (2d Cir.1975)) (stating that "[t]wo separate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended . . . and whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case"); *In re Gas Reclamation, Inc. Securities Litigation*, 733 F.Supp. at 733 (finding that "whether or not the indemnity agreements should be treated as part of a single contract with the other documents in the PPM also depends on issues of disputed fact").[23]

_____

[22]  The Court notes that once factual disputes as to the intended purpose of the contracts have been resolved by the jury, the question of *how* the 21 instruments may be read together to make for a single transaction (or not) may then become a question of law which will be relevant to the privity issue.  *See generally, Turtur*, 892 F.2d 199, 204.  Should this case go to trial, the Parties should be well versed beforehand to address this issue.  Moreover, and while not addressed in this Order, the Parties are also put on notice that they may possibly need to address the question of whether the issuers' exemption is relevant to Plaintiff's privity theory based on the interrelationship of the contracts.  *See Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 752 F.2d 178, 181 n.4 (5th Cir. 1985) (holding issuers are exempt from the registration requirements for brokers and dealers under Section 15 of the Exchange Act).

[23]  Tellingly, the *In re Gas Reclamation, Inc. Securities Litigation* decision is not too far removed from the instant case in so far that it involved application of Section 29(b) under the Exchange Act with respect to third party indemnity agreements.  733 F.Supp.at 733.

2.      Privity Jury Instructions Relevant to the Federal Claim

Given the novel nature of Plaintiff's privity theory, the Parties are to file

preliminary jury instructions in advance of when such filings would typically become due

under the Court's Practice Standards.[24]  Specifically, each party (collectively for

Defendants) shall file preliminary jury instructions **as to the Federal Claim only** by no

later than 5 p.m., Monday, December 16, 2013.  The Court is seeking preliminary jury

instructions on the Federal Claim to better assess the contours of Plaintiff's theory and

the precise language that should be put to the jury with respect to each Defendant.

The Court notes that the Parties will have a right to amend these jury instructions

for 'good cause' closer to the trial date should settlement in this action not be reached.

**C.     Whether Plaintiffs Can Claim Money Damages Under Section 29(b) of the Exchange Act**

The third issue for the Court was whether Plaintiff could claim damages under

Section 29(b) of the Exchange Act.  But because Plaintiff conceded the third issue in its

initial responsive briefing, the Court does not address it in any significant way other than

to say that Plaintiff will be prevented from pressing that argument at trial. (ECF No. 94 at

31.)  While Plaintiff withdrew the original concession from previous briefing in ECF No.

116, the Court disregards this turnabout.  The purpose of the supplemental briefing was

strictly limited. Contrary to Plaintiff's view, it did not include further briefing on the money

damages issue.  (ECF No. 113 at 1) (stating the "Parties should refile their briefing with

---

[24]  The Court expressly reserves its judgment to reconsider the privity issue again after the Parties have filed preliminary jury questions.  And to make clear, the Court notes that this Order will not restrict the Court's view in finding privity issue may not have merit to be put to a jury subject to a Rule 50 Motion after there has been further factual development.

relevant case law (if any) on: (a) the privity issue, and (b) the private cause of action issue, as those issues are defined in Defendants' Motion").  Having conceded a position at his own volition in ECF No. 94, without any foul-play by Defendants, the Court finds it highly prejudicial to now permit renewal of the damages issue with trial soon approaching.

### IV. CONCLUSION

Based on the foregoing, the Court ORDERS as follows:

1.      Defendants' Motion for Summary Judgment (ECF No. 115) on  Plaintiff's Federal Claim is DENIED.

2.      The Parties shall file preliminary jury instructions as to the **Federal Claim only** in this matter by no later than 5 p.m., Monday, December 16, 2013, consistent with this Order.

Dated this 7th day of November, 2013.

BY THE COURT:

William J. Martinez
United States District Judge